UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RANDY PHIPPS SALAZAR,<br><br>        Petitioner,<br><br>    v.<br><br>G. LEWIS, Warden,<br><br>        Respondent. | Case No.  11-cv-01189-JST (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY** |

      Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by petitioner Randy Phipps Salazar, challenging the validity of a judgment obtained against him in state court.  Respondent filed an answer to the petition.  Petitioner has filed a traverse.

## I. PROCEDURAL HISTORY

      On June 20, 2008, a Contra Costa County jury found petitioner and his co-defendant Eric Anderson ("Anderson") guilty of the murder of Matthew Stephens ("Stephens").  (Ex. 1 at 1492-1506.[1])  An earlier trial had ended in a hung jury.  (Id. at 1165-66.)  At the June 2008 trial, the jury found both petitioner and Anderson guilty of first-degree felony murder, attempted second degree robbery, and carrying a loaded firearm while a member of a street gang.  (Id. at 1492-1506.)  As to the murder and robbery, the jury also found true allegations that petitioner and Anderson committed the offenses for the benefit of a street gang.  (Id. at 1493-1500.)  On August 26, 2008,

---

[1] All references herein to exhibits are to the exhibits submitted by respondent in support of the answer.

the trial court sentenced petitioner to the principal term of life without the possibility of parole and imposed a consecutive term of 25 years to life on the firearm enhancement.  (Id. at 1733.)

Petitioner directly appealed the judgment in the California Court of Appeal.  (Ex. 6.)  On August 31, 2010, in a reasoned opinion, the California Court of Appeal ordered the abstract of judgment amended to reflect the judgment of the trial court and in all other respects affirmed the judgment.  People v. Salazar, No. A122794, 2010 WL 3420122 (Cal. Ct. App. Aug. 31, 2010).  On December 15, 2010, the California Supreme Court summarily denied the petition for review.  (Ex. 12.)  The instant petition was filed on March 10, 2011.

## II.  STATEMENT OF FACTS

The following background facts describing the crime and evidence presented at trial are from the opinion of the California Court of Appeal.[2]:

> On September 21, 2004, at approximately 4:30 a.m., defendants[3] were out "rooting," i.e., looking for someone to rob.  [Petitioner] was a high-ranking member of the Elite Northern Empire, a subset of the Norteño gang in the Antioch area.  His street name was "Oso."  Anderson was an "independent Norteño," but police believed he was trying to associate himself with the Pittsburg Norteño subset "Crazy Ass Latinos," or "CAL."  His street name was "E-Lo."
>
> Defendants saw Stephens standing by his car.  Anderson later told his friend Michael Johnson that Stephens was putting on his shirt.  Armed with [petitioner's] revolver, Anderson walked up to Stephens and put the gun in Stephens' side.  Stephens resisted and struggled with Anderson.  Anderson shot Stephens in the face.  The autopsy physician removed a .22 bullet from Stephens' brain.
>
> Stephens' blanket was found near his body.  It was soaked with blood, contained his glasses, and bore gunshot residue and a bullet hole consistent with a small caliber weapon, such as a .22.  No bullet casings were found at the scene, except for a .40 casing dropped by an investigating officer; this was consistent with a revolver being used as the murder weapon.
>
> Just before the shooting, William Eby, a bus driver, was walking to work.  He walked past a housing complex and saw a white car enter the complex and park.  He thought it was odd for the car to be there so early in the morning.  Because there had been problems with

---

[2] This summary is presumed correct.  Hernandez v. Small, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

[3] All references to "defendants" in the Court of Appeal's opinion are to petitioner and his co-defendant, Eric Anderson.

2

stolen cars being dropped off in the complex's parking lot, Eby walked behind the white car to get its license plate number. As he was six to 10 feet from the passenger side, the two men in the car turned to look at him. Eby identified [petitioner] as the driver and Anderson as the passenger. Defendants seemed "kind of agitated and stressed."

Eby walked past the car, which then proceeded down the street in his direction, passing him. The car turned onto East Lake Drive. Eby followed, turned the corner onto East Lake Drive, and saw the white car had stopped at the end of the block near the intersection with East Lake Court. A few seconds later he heard a "pop," that sounded to him like a muffled shot from a small caliber gun. After a few seconds, possibly no longer than 15, Eby saw the white car back up, spin around, and drive toward and past him at a speed of 50 miles per hour, in the direction of the waterfront. Eby walked to the end of the block and saw Stephens' body lying by his car. The driver's door was open and Eby heard the door chime, meaning the keys were in the ignition. Eby called 911.

Defendants immediately drove to the waterfront. [Petitioner] threw into the water the handgun used to kill Stephens. They changed clothes and abandoned the white car on East 6th Street, a few minutes from the crime scene. Later that morning, Eby identified the car as the one he had seen that morning. Near the car, police recovered clothing; a Budweiser carton; and checks and identification in a number of different names, which appeared to have been stolen.

. . .

. . . Not long after the murder, and after they changed clothes, abandoned the white Pontiac, and disposed of the murder weapon, defendants went to the home of [petitioner's] girlfriend, Yamileh "Yami" Serrano.

Later that morning, Gabriel Perez awoke and called [petitioner] to find out the whereabouts of the white Pontiac. [Petitioner] lied to him and told him the car – which defendants had abandoned near the crime scene – was downtown. Gabriel sent his brother Eric and [Phil] Makinano downtown on bicycles to retrieve the car. They could not find it.

[Petitioner] went to Cadillac Dan's house and met with Gabriel, who confronted him about the missing car. [Petitioner's] behaviour was suspicious, making Gabriel think [petitioner] had sold the Pontiac. [Petitioner] told Gabriel Perez to stop looking for the Pontiac. [Petitioner] also said that if he saw the car again he would "burn" it. [Petitioner] admitted participation in the murder and attempted robbery to Gabriel Perez. Specifically, [petitioner] told Perez about his involvement and that Anderson and Stephens wrestled over the gun and the gun went off. [Petitioner] told Gabriel not to tell anyone about the crimes, not even his brother Eric.

On the evening of the day of the murder, Anderson went to the home of "Tattoo Fernando" Flores to get a gang tattoo – apparently the word "Northern" above the initials "CAL," i.e., "Crazy Ass Latinos." "Little Fernando" Coria was at Flores' house. Anderson told Coria about the murder and asked for his advice. Coria told Anderson he should not tell anyone about the killing; Anderson responded that he had already told eight people. Coria told Anderson to stop talking about the murder. Anderson left without getting his tattoo.

> At 6:40 p.m. on the evening of the day of the murder, police went to [Nicole] Martin's apartment and arrested Gabriel Perez on a probation violation. After four interviews, Gabriel told police that [petitioner] had admitted the murder and attempted robbery to him. Gabriel told police his disclosure of [petitioner's] admission put his life in jeopardy, and he was nervous.
>
> A week after the murder, the *Contra Costa Times* published an article naming defendants as suspects in the murder, and published defendants' pictures. At that time, Anderson was staying with a friend, Michael Johnson, who saw the article. Anderson admitted the murder and attempted robbery to Johnson. Anderson told Johnson that [petitioner] had given him the gun; that he put the gun in Stephens' side; that Anderson and Stephens struggled over the gun and Anderson shot Stephens; and after the shooting Anderson and [petitioner] changed clothes and got rid of the car. Johnson told Anderson he should turn himself in. Anderson surrendered to police in October 2004.
>
> [Petitioner] was apprehended in the early morning hours of October 3, 2004, after a lawful police pursuit unrelated to the murder.
>
> Antioch Police Officer Thomas Lenderman qualified as an expert on street gangs, including the Norteño gang. In his expert opinion, based on several factors, both defendants were active members of the Norteño gang.
>
> Defendants did not testify at trial. They presented expert testimony showing that the physical evidence linking them to the white Pontiac was inconclusive. Through counsel, they attacked the credibility of prosecution witnesses and claimed innocence. They assailed the identification testimony of Eby, and argued it was tainted by the newspaper photographs. They argued that most of the prosecution witnesses were not to be believed because they had prior convictions, poor memories due to drug use, inconsistencies in their testimony, and motivations to lie.

People v. Salazar, No. A122794, 2010 WL 3420122 at *1-4 (Cal. Ct. App. Aug. 31, 2010) (footnotes omitted).

### III. DISCUSSION

A.  Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication

4

of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict."  Penry v. Johnson, 532 U.S. 782, 795 (2001) (internal citation omitted).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent."  Williams, 529 U.S. at 405-06.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence.  "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  Williams, 529 U.S. at 412.  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous."  Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

Here, as noted, the California Supreme Court summarily denied petitioner's petition for review.  The Court of Appeal, in its opinion on direct review, addressed one of the two claims petitioner raises in the instant petition.  The Court of Appeal thus was the highest court to have reviewed that claim in a reasoned decision, and, as to that claim, it is the Court of Appeal's

decision that this Court reviews herein. See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005). As to the claim for which there is no reasoned opinion available, the United States Supreme Court has clarified that the absence of reasoning does not prevent application of the standard of review set forth in § 2254(d). See Harrington v. Richter, 131 S. Ct. 770, 784 (2011) ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.").

B.  Petitioner's Claims

Petitioner asserts the following grounds for relief: (1) prosecutorial misconduct; and (2) violation of his Sixth Amendment Confrontation Clause rights.

1.  Prosecutorial Misconduct

Petitioner claims the prosecution improperly posed leading questions on direct examination of witness Yamileh Serrano ("Serrano"), insinuating that petitioner admitted to having taken part in the murder. (Petition at 28.[4]) Petitioner also claims the prosecution improperly referenced the factual content of those questions during closing argument. (Id.) The Court of Appeal summarized the background of this claim as follows:

> Serrano was, to put it mildly, a reluctant witness. She testified at the preliminary hearing, admitting she knew defendants, but denying she had any conversation with [petitioner] about the murder. She admitted telling police about such a conversation, but claimed she had been lying because she was scared. Serrano then asked for an attorney and refused to testify any further – even after a grant of transactional immunity and an order holding her in contempt.
>
> Antioch Police Detective Marty McCann testified at the preliminary hearing that Serrano had told him on October 6, 2004 – about two weeks after the murder – that [petitioner] had confessed to her that he and Anderson came upon Stephens when they were looking for someone to "rip or to jack." [Petitioner] told Serrano that Anderson got out of the car while [petitioner] stayed inside in order to be ready to leave; that Anderson wrestled with the victim and the gun went off; and that [petitioner] felt bad about the killing and felt sorry for Stephens' family.

/ / /

---

[4] The page numbers used herein for the Petition refer to those affixed to the top of the page by the Court's electronic filing program.

Despite a bench warrant, Serrano did not appear for defendants' first trial.  That trial ended in a mistrial when jurors could not reach a verdict.

Before defendants' second trial, Serrano was taken into custody on a probation violation.  The prosecutor informed the court that, should Serrano again refuse to testify, "the People will be requesting that she testify in front of the jury relat[ing] to an invalid refusal to answer questions particularly in light of the gang allegations in this case."

The prosecutor granted Serrano immunity for her trial testimony.  Outside the presence of the jury, the People called Serrano to the witness stand.  She invoked her Fifth Amendment privilege and refused to testify.  The court informed Serrano she had been granted immunity and no longer had a Fifth Amendment privilege to refuse to testify.  Serrano continued to refuse to answer questions, and the trial court found her in contempt and remanded her into custody.  The prosecutor asked that the court require Serrano to "refuse to answer questions in front of the jury based on the gang enhancements in this case."

In court the next week, also outside the presence of the jury, the People again called Serrano to the stand.  Serrano continued to refuse to answer questions.  The prosecutor again asked that the court require Serrano to state her refusal in front of the jury.

The prosecutor then made this offer of proof:

"[I] believe Ms. Serrano would testify that the morning following the murder of Matthew Stephens ... when she got home to her parents' house, that [petitioner] was there.  Mr. Anderson had been there.  And that within about a week and a half of the murder she was at a motel with [petitioner] and that [petitioner] confessed to her."

From this offer of proof, the trial court determined that Serrano's testimony was "clearly relevant," and that it was appropriate under *People v. Lopez* (1999) 71 Cal.App.4th 1550 (*Lopez*) for the People to place Serrano before the jury "and let the jury draw whatever inference it chooses from her refusal to testify."

The People called Serrano to the witness stand in the presence of the jury. The following colloquy ensued:

"BY [THE PROSECUTOR]:

"Q.: Ms. Serrano, in late September or early October of 2004, did [petitioner] tell you that he and Eric Anderson were out looking for a car to jack or rob and that they saw a guy that they thought wouldn't fight back, that he looked a little dorky, and that Eric got out of the car with the gun and wrestled with the guy, and Eric shot the guy as he was standing by the car?

"A.: I'm still going to refuse.

"Q.: To what?

"A.: I'm going to go ahead and use my Fifth Amendment – or I can't, but I'm refusing to answer any questions.

"[THE PROSECUTOR]: Your Honor, will the Court, based on the People's grant of use immunity, order this witness to answer the question?

"THE COURT: Yes. [¶] Ms. Serrano, as we previously discussed, you have use immunity which was granted by the District Attorney's Office. And based on the use immunity, I'm ordering that you answer these questions.

"THE WITNESS: I'm still refusing.

"BY [THE PROSECUTOR]:

"Q.: Okay. You understand that you have no valid Fifth Amendment privileges in this case; do you not?

"A.: Yes, I do.

"Q.: And understanding that, you understand that you will be held in contempt of Court for refusing to answer these questions?

"A.: I understand that.

"Q.: Okay. And that you will be held in custody for refusing to answer these questions?

"A.: I understand that.

"Q.: And Ms. Serrano, did [petitioner] tell you in late September or early October of 2004 that when the guy started to wrestle with Eric, because of the way Eric was holding the gun he ended up shooting the guy in the face?

"A.: I'm refusing to answer any questions.

[¶] ... [¶]

"BY [THE PROSECUTOR]:

"Q.: Ms. Serrano, on-in the midmorning hours between 9:00 in the morning and 11:00 in the morning, did you arrive home at your parents' home in Antioch and find [petitioner] in your bedroom?

"A.: I'm refusing all questions.

"Q.: You're refusing to answer that question?

"A.: Yes.

"Q.: Okay. And Ms. Serrano, were you in a dating relationship with [petitioner] in 2004?

"A.: I'm not going to answer any questions.

8

"Q.: And did Randy Salazar in September of 2004 call you on the streets his 'wife'?

"A.: I'm still refusing to answer that.

"Q.: Ms. Serrano, did [petitioner] in late September or early October of 2004 tell you that he was very sorry for the murder of Matthew Stephens, that all Matthew was doing was getting ready to go to work, and that he had a lot of sympathy for Matthew's family?

"A.: Once again I'm refusing to answer."

Defense counsel asked the court to admonish the jury "that the words of counsel cannot be considered as evidence." The court said it would consider an admonition, but did not give one at that time. Defense counsel did not object to the questioning on the ground that the prosecutor was putting forth facts as evidence in the form of leading questions. Counsel moved for a mistrial on an unrelated ground – whether the jury might have seen Serrano in handcuffs in the hallway-but did not raise the leading question issue. The court denied the mistrial motion. Counsel did not request an admonition at that time.

In closing argument to the jury, the prosecutor made three references to supposed facts based on statements made by [petitioner] to Serrano that were not in evidence, i.e., had been put forward by the mechanism of the leading questions to Serrano.

(1) *[Petitioner's] Statement of Remorse.* The prosecutor argued: "There is one undisputable in this case: Matthew Stephens was murdered on September 21st. And in the words of [petitioner] he was a completely innocent victim. He was a guy getting ready to go to work. And in the words of [petitioner] he didn't deserve to die. He died for selfish reasons."

(2) *An Unspecified Statement of [petitioner] to Serrano.* During argument, the prosecutor stressed that Gabriel Perez' description of [petitioner's] confession to him was credible. The prosecutor argued that the confession was consistent with Anderson's confessions to other witnesses, and "[petitioner's] comment to" Serrano.

(3) *The Leading Questions Themselves.* The prosecutor directly referred to the leading questions which Serrano refused to answer, and argued the jury could consider the factual content of the questions. After discussing Gabriel Perez' testimony, as well as Michael Johnson's, in which Johnson claimed he couldn't recall Anderson's statements to him-despite Johnson's describing those statements to police-the prosecutor argued:

"So you may choose to reject Gabe Perez, Michael Johnson, but then we have Yamileh Serrano, the witness that refused to answer any questions in this courtroom. You can consider that refusal, and you may consider what was in the question that she refused to answer."

Defense counsel made no contemporaneous objection to either (1) or (2). [Petitioner's] counsel objected to (3). During a recess, defense counsel objected that the jury could not consider the factual content of the leading questions as evidence. Defense counsel also moved for a mistrial on the grounds of prosecutorial misconduct, arguing the prosecutor

9

had referred to matters outside the record, invited the jury to speculate as to Serrano's possible answers to the leading questions, and denied defendants their right of confrontation.

The trial court agreed that the prosecutor's questions could not be considered as evidence and that the jury would be so admonished. The court denied the mistrial motion. When court reconvened the court admonished the jury "that the arguments of the attorneys are not evidence. The evidence is simply what you heard from the witness stand and any documents that are submitted to you for your review."

Prior to deliberations, the court instructed the jury with CALJIC No. 1.02, which reads, as here pertinent:

"Statements made by the attorneys during the trial are not evidence. . . . [¶] [D]o not assume to be true any insinuation suggested by a question asked of a witness. A question is not evidence and may be considered only as it helps you to understand the answer."

Defendants moved for a new trial based on the alleged prosecutorial misconduct discussed above. The court denied the motion, noting the court had given the cautionary instruction CALJIC No. 1.02. The court also noted any error would not be prejudicial given the other evidence of defendants' guilt – which we regard as more than substantial. The court also noted Serrano's hostile demeanor, and found the jury could have interpreted her refusal to answer questions and "defiance to the Court" as "based on the gang mentality of not testifying against each other."

Salazar, 2010 WL 3420122 at *10-13.

The Court of Appeal rejected petitioner's prosecutorial misconduct claim concluding that, while the prosecution's questions were inappropriate, they did not prejudice petitioner:

Defendants argue that the prosecutor's leading questions, and jury argument based thereon, constitute misconduct. We agree that the leading questions were inappropriate. While it was permissible for the court to require Serrano claim her Fifth Amendment privilege, and refuse to answer questions, in the jury's presence (*Lopez, supra*, 71 Cal.App.4th at pp. 1555-1556), it was not permissible for the prosecutor to, in effect, introduce evidence in the form of the factual content of her leading questions. (See *People v. Rios* (1985) 163 Cal.App.3d 852, 868-869.)

But the giving of the admonition and CALJIC No. 1.02 cured any error. The jury was told in no uncertain terms that a statement made, or a question posed, by an attorney is not evidence. Jurors are presumed to follow the trial court's instructions and decide the question of guilt on proper evidence. (See, e.g., *People v. Barnett* (1998) 17 Cal.4th 1044, 1157; *People v. Clair* (1992) 2 Cal.4th 629, 663, fn. 8 ["We presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade."]

We find no prejudicial error.

Salazar, 2010 WL 3420122 at *13 (footnote omitted).

10

1    Prosecutorial misconduct is cognizable in federal habeas corpus; "the appropriate standard
2 of review for such a claim . . . is the narrow one of due process, and not the broad exercise of
3 supervisory power." <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986) (internal quotation and
4 citation omitted).  A defendant's due process rights are violated when a prosecutor's misconduct
5 renders a trial "fundamentally unfair." <u>Id.</u>; <u>Smith v. Phillips</u>, 455 U.S. 209, 219 (1982) (noting,
6 "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness
7 of the trial, not the culpability of the prosecutor").  Under <u>Darden</u>, the first issue is whether the
8 prosecutor's remarks were improper; if so, the next question is whether such conduct "infected the
9 trial with unfairness." <u>Tan v. Runnels</u>, 413 F.3d 1101, 1112 (9th Cir. 2005).  A prosecutorial
10 misconduct claim is decided by "examining the entire proceedings to determine whether the
11 prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a
12 denial of due process." <u>Johnson v. Sublett</u>, 63 F.3d 926, 929 (9th Cir. 1995) (internal quotation
13 and citation omitted).

14    The first factor in determining whether misconduct amounted to a due process violation is
15 whether the trial court issued a curative instruction to the jury.  <u>See e.g.</u>, <u>U.S. v. de Cruz</u>, 82 F.3d
16 856, 862 (9th Cir. 1996); <u>U.S. v. Simtob</u>, 901 F.2d 799, 806 (9th Cir. 1990); <u>U.S. v. Polizzi</u>, 801
17 F.2d 1543, 1558 (9th Cir. 1986).  When a curative instruction is issued, a court presumes that the
18 jury has disregarded the improper remarks and that no due process violation occurred.  <u>See</u> <u>Greer
19 v. Miller,</u> 483 U.S. 756, 766, n.8 (1987).

20    Other factors which a court may take into account in determining whether misconduct rises
21 to a due process violation are: (1) the weight of evidence of guilt, <u>United States v. Young</u>, 470
22 U.S. 1, 19 (1985); (2) whether the misconduct was isolated or part of an ongoing pattern, <u>see
23 Lincoln v. Sunn</u>, 807 F.2d 805, 809 (9th Cir.1987) ("courts will not reverse when the prosecutorial
24 comment is a single, isolated incident, does not stress an inference of guilt from silence as a basis
25 of conviction, and is followed by curative instructions"); and (3) whether the misconduct relates to
26 a critical part of the case, <u>see Giglio v. United States</u>, 405 U.S. 150, 154 (1972) (failure to disclose
27 information showing potential bias of witness especially significant because government's case
28 rested on credibility of that witness).

Here, respondent concedes that the prosecution's leading questions to Serrano and references to such questions during closing argument were inappropriate. (See Brief in Supp. of Answer at 11.)   However, the prosecutor's misconduct did not infect the trial with such unfairness that the resulting conviction was a denial of due process.

First, the court instructed the jury multiple times that the statements and questions of attorneys are not evidence.  During cross-examination of prosecution witness Nicole Martin, the court cautioned the jury that "questions are not evidence."  (Ex. 4 at 1435.)  The court re-iterated that admonishment during the prosecution's direct examination of Officer Thomas Lenderman: "Remember, ladies and gentlemen, questions are not evidence.  Only the answers are evidence." (Id. at 1855.)  Prior to the prosecution's opening argument, the court instructed the jury that "[s]tatements made by attorneys during the trial are not evidence," (id. at 2090-91), and during the prosecution's closing argument, the court instructed that:

> [T]he arguments of attorneys are not evidence.  The evidence is simply what you heard from the witness stand and any documents that are submitted to you for your review.

(Id. at 2156).  Finally, as noted above, the court issued to the jury CALJIC No. 1.02.  (Ex. 1 at 1097.)  Having been adequately instructed, the jury is presumed to have ignored the prosecutor's improper remarks.  See Greer, 483 U.S. at 765-66 (prosecutor's misconduct in commenting on defendant's silence cured by proper instruction).

Second, the evidence weighs heavily against petitioner.  Eby identified petitioner as the driver of the white car that he had observed at the crime scene.  (Ex. 4 at 1157-58.)  Gabriel Perez testified that Anderson and petitioner were in possession of the white car shortly before the murder.  (Id. at 1280-81.)  Petitioner was also identified as a potential contributor to DNA found on a shoe that was left at the location where the car had been abandoned.  (Id. at 1803-04.) Anderson's confessions to Michael Johnson, (id. at 1623-31), and Fernando Coria, (id. at 2017-26), were consistent with petitioner's confession to Gabriel Perez, (id. at 1284-90).  Further, Fernando Coria saw petitioner in possession of a revolver (the type of firearm used in the murder) on the evening before the murder.  (Id. at 2024.)

/ / /

Third, the misconduct was not extensive, occurring only during the prosecution's direct examination of Serrano and closing argument.  See U.S. v. Wright, 625 F.3d 583, 609-13 (9th Cir. 2010) (several improper prosecutorial statements introducing evidence into the record and injecting personal views on evidence during 10-day trial were "relatively isolated incidents").

Lastly, the misconduct did not relate to a critical part of the case.  In her remarks to Serrano, the prosecutor insinuated that petitioner confessed his role in the murder to Serrano.  (Ex. 4 at 1713-15)  These remarks, however, tended merely to corroborate the testimony of Gabriel Perez, Michael Johnson, and Fernando Coria; they did not directly implicate petitioner, nor did they form the sole basis of his guilt.

In sum, the trial court corrected the improper statements made by the prosecution, and the other factors weigh against petitioner.  The state courts' rejection of this claim was not contrary to, nor an unreasonable application of, Supreme Court precedent.  28 U.S.C. § 2254(d).  Accordingly, petitioner is not entitled to habeas relief on his prosecutorial misconduct claim.

2.    Confrontation Clause

Petitioner claims the prosecution's leading questions to Serrano and references to those questions in closing argument also denied him his Sixth Amendment right to confront witnesses against him.  (Petition at 44.)

The Confrontation Clause of the Sixth Amendment provides that, in criminal cases, the accused has the right to "be confronted with the witnesses against him."  U.S. Const. amend. VI.  The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee.  Crawford v. Washington, 541 U.S. 36, 61 (2004).  It commands not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.  See id.; see also Davis v. Alaska, 415 U.S. 308, 315-16 (1974) (noting "a primary interest" secured by the Confrontation Clause "is the right of cross-examination").  The right to cross-examine under the Confrontation Clause provides the opportunity to "expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness."  Davis, 415 U.S. at 318.

/ / /

The Confrontation Clause applies to all "testimonial" statements. Crawford, 541 U.S. at 50-51. "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." Id. at 51 (internal quotation and citation omitted). "An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." Id. Out-of-court statements by witnesses that are "testimonial" in nature are barred under the Confrontation Clause unless (1) the witness is unavailable, and (2) the defendant had a prior opportunity to cross-examine the witness. Id. at 59.

"Confrontation Clause violations are subject to harmless error analysis." United States v. Nielsen, 371 F.3d 574, 581 (9th Cir. 2004); see also United States v. Allen, 425 F.3d 1231, 1235 (9th Cir. 2005). For purposes of federal habeas corpus review, the standard is whether the allegedly inadmissible evidence "'had substantial and injurious effect or influence in determining the jury's verdict.'" Hernandez v. Small, 282 F.3d 1132, 1144 (9th Cir. 2002) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

Assertion of the Fifth Amendment privilege against self-incrimination by a witness, thus preventing cross-examination, constitutes unavailability of that witness. See California v. Green, 399 U.S. 149, 167 (1970); Whelchel v. Washington, 232 F.3d 1197, 1204 (9th Cir. 2000). Here, however, Serrano's purported prior statements that petitioner had confessed to the shooting were not admitted into evidence because the content of the prosecution's questions relating to the purported prior statements was not in evidence. As discussed, the court instructed the jury that the statements of attorneys are not evidence. (Ex. 1 at 109; Ex. 4 at 1435, 1855, 2090, 2156.) Therefore, the prosecution's questions to Serrano did not violate the Confrontation Clause.

Further, the prosecution never asked Serrano about statements she purportedly made to the police. Nor did the prosecution attempt to introduce statements made in connection with any government proceeding or investigation. At most, the prosecution's offer of proof and questions to Serrano related only to petitioner's alleged confession to Serrano. Petitioner has pointed to no authority, nor is the Court aware of any, suggesting that such remarks are "testimonial" for purposes of the Confrontation Clause under Crawford. Because the statements were

nontestimonial, to the extent they were admitted or considered by the jury, they did not violate the Confrontation Clause.

Petitioner relies on Douglas v. Alabama, 380 U.S. 415 (1965), in support of his claim. (Petition at 44.) In Douglas, the defendant and another man, Loyd, were charged with assault with intent to murder. Douglas, 380 U.S. at 416. The state tried Loyd first, and a jury convicted him. The prosecutor called Loyd as a witness at the defendant's trial, but Loyd asserted the Fifth Amendment and refused to answer questions about the incident. Id. at 416.

While questioning Loyd, the prosecutor read a confession Loyd allegedly made to the police wherein he inculpated the defendant. Id. "Under the guise of cross-examination to refresh Loyd's recollection, the [prosecutor] purported to read from the document, pausing after every few sentences to ask Loyd, in the presence of the jury, 'Did you make that statement?' Each time, Loyd asserted the privilege and refused to answer, but the [prosecutor] continued this form of questioning until the entire document had been read." Id. at 416-17 (footnote omitted). The statements the prosecutor read from the document "recited in considerable detail the circumstances leading to and surrounding the alleged crime; of crucial importance, they named the [defendant] as the person who fired the shotgun blast which wounded the victim." Id. at 417 (footnote omitted). The United States Supreme Court reversed the conviction, holding that the defendant's inability to cross-examine Loyd about the alleged confession denied him "the right of cross-examination secured by the Confrontation Clause." Id. at 419.

Petitioner's reliance on Douglas is misplaced. In Douglas, the defendant did not move to strike either the witness's nonresponsive testimony or the prosecutor's leading questions. Here, the court cautioned the jury multiple times that the statements of attorneys are not evidence, (Ex. 4 at 1435, 1855, 2090, 2156), and instructed the jury to the same effect with CALJIC No. 1.02, (Ex.1 at 1097). "The assumption that jurors are able to follow the court's instructions fully applies when rights guaranteed by the Confrontation Clause are at issue." Tennessee v. Street, 471 U.S. 409, 415 n. 6 (1985); see also Richardson v. Marsh, 481 U.S. 200, 211 (1987) ("Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction . . . ").

Further, the Supreme Court overturned the conviction in Douglas because the testimony at issue was the only direct evidence of the defendant's culpability. See Douglas, 380 U.S. at 419. Here, as discussed, Serrano's testimony was not the only evidence of petitioner's guilt; there was other independent evidence connecting petitioner with the murder, including physical evidence, (Ex. 4 at 1803-04), the testimony of William Eby, (id. at 1157-58), confessions that Anderson made to Fernando Coria and Michael Johnson, (id. at 1623-31, 2017-26), and a confession that petitioner made to Gabriel Perez, (id. at 1284-90). See U.S. v. Larson, 495 F.3d 1094, 1108 (9th Cir. 2007) (Confrontation Clause violation rendered harmless by strength of other evidence and court instruction).

The state courts' rejection of this claim was not contrary to, nor an unreasonable application of, Supreme Court precedent. 28 U.S.C. § 2254(d). Accordingly, petitioner is not entitled to habeas relief on his Confrontation Clause claim.

C.   Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. See Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard. Id. § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

Here, petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

/ / /

/ / /

/ / /

## IV.  CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED**.

Dated:  September 15, 2013

_____
JON S. TIGAR
United States District Judge